UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Malveaux, Athey and Callins
Argued at Lexington, Virginia


JOHN ROBERT MARTIN, S/K/A
  JOHN ROBERT MARTIN, JR.

v.        Record No. 0757-22-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE CLIFFORD L. ATHEY, JR.
APRIL 18, 2023

FROM THE CIRCUIT COURT OF SCOTT COUNTY
John C. Kilgore, Judge

Melanie B. Salyer (Michael Brett Hall, on briefs), for appellant.

Lauren C. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


The Circuit Court of Scott County ("trial court") convicted John Robert Martin, Jr.,

("Martin") of the first-degree murder of Nicholas Pierce ("Pierce") and the use of a firearm in the

commission of a felony.  Martin appeals arguing that the trial court erred in: (1) denying his motion

to suppress statements allegedly made in violation of his Fifth Amendment rights, (2) permitting

bad acts evidence to be admitted at trial, (3) compelling his wife to testify against him despite her

assertion of her marital privilege, (4) refusing to allow the jury to visit the scene of the shooting,

(5) denying Martin's motion to dismiss the charge of aggravated malicious wounding, (6) allowing

the jury to hear evidence of Martin's felony abduction conviction, (7) preventing Martin from

questioning the jury venire during voir dire regarding sentencing ranges for the alleged crimes,

(8) admitting testimony pertaining to Martin's prior cell phone search history, (9) denying Martin's

*Batson* challenge, (10) denying Martin's post-trial motion for a new trial because Pierce's mother

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413

was present during trial showing emotion, (11) denying Martin's post-trial motion for a new trial because, as a resident of Tennessee, he did not receive a jury of his peers in Virginia, (12) denying Martin's motion to strike for lack of evidence of malice. For the reasons to follow, we reject Martin's arguments and affirm the trial court's judgment.

I. BACKGROUND

A. *The Day of Pierce's Murder*

Martin married Dawn Martin ("Dawn") in 2003. In May of 2018, the couple resided in Tennessee and was contemplating divorce. Dawn was involved in an extramarital relationship with Nicholas Pierce ("Pierce") while continuing to live with Martin. Martin was aware that his wife was planning to move out of their marital home.

On May 3, 2018, at approximately 7:30 a.m., Martin drove his Ford Bronco to the Tennessee home of his brother-in-law and sister-in-law, Cody and Samantha Watts. Upon arrival, Martin stated he was there to give Pierce, who was staying with the Watts, a ride to the bank. Pierce subsequently left with Martin.

Sometime later that morning at the marital residence, Dawn was awakened by Martin shoving a handgun into her ribs. Martin showed his wife a photograph on his cell phone of Pierce who appeared to be dead with a visible wound behind his ear. Martin told his wife: "look what you made me do." He then confessed to her that he had shot Pierce "in the balls" and behind his ear. Next, Martin bound Dawn's hands and feet with zip ties. Then, he further confessed that, based on hidden recording devices he had placed in her truck and their bedroom, he had learned of her extramarital affair with Pierce. He also played some of the recordings from the device and advised her that he now had to finish his plan of killing her and committing suicide. Dawn was eventually able to persuade Martin to remove the zip ties and go with her to pick up her son and his girlfriend. Without Martin knowing, Dawn was subsequently able to tell

her son's girlfriend what Martin had done to her, and Dawn asked her to contact law enforcement. Dawn also managed to tell her brother what had occurred that morning.

Both Dawn's brother's girlfriend and her son's girlfriend contacted law enforcement to relay Dawn's message. Later that afternoon, Tennessee law enforcement arrested Martin. Dawn was interviewed by Detectives David LaFollette of the Hawkins County Tennessee Sheriff's Office ("Detective LaFollette") and Chris Holder of the Scott County Virginia Sheriff's Office ("Detective Holder"). Detective LaFollette and Detective Holder also interviewed Martin who admitted to binding Dawn with zip ties and showing her the cell phone images of the deceased Pierce. Martin advised law enforcement of the location on Cameron Church Road in Scott County, Virginia, where law enforcement could recover Pierce's body. They communicated this information to Detective Boggs of the Hawkins County Tennessee Sheriff's Office, who travelled to Virginia and secured the crime scene where the deceased body of Pierce was located. Detective Boggs remained at the scene until Lieutenant David Woody of the Scott County Virginia Sheriff's Office arrived at the scene to recover Pierce's body and investigate the scene of the crime.

B. *Pre-Trial Hearings in Virginia*

Martin was subsequently charged in Hawkins County, Tennessee, with kidnapping. He pled guilty pursuant to a plea agreement, and the Tennessee court found him guilty. Martin was also charged in Scott County, Virginia, with first-degree murder and use of a firearm while committing a felony (murder).

Both Martin and the Commonwealth filed multiple pre-trial motions. Martin argued his *Miranda v. Arizona*, 384 U.S. 436 (1966), rights had been violated and sought to suppress statements he made to Detective Holder admitting to shooting Pierce but claiming he did so

accidentally and defensively. He also made a motion to dismiss, arguing he could not be prosecuted for both first-degree murder and aggravated malicious wounding.

At the hearing held on July 29, 2020, Detective Holder testified that on May 4, 2018, he traveled to the Rogersville Tennessee jail where Martin was incarcerated awaiting trial on the kidnapping charges. Detective Holder testified that he advised Martin of his *Miranda* rights and Martin completed an advice of rights form indicating that he had been advised and understood his constitutional rights pursuant to the *Miranda* warnings. Detective Holder further testified that Martin then stated that he wished to speak to an attorney, and Detective Holder immediately ceased questioning concerning the investigation. Detective Holder did ask Martin about his health, in part, because Holder and Martin knew each other from having attended high school together. Detective Holder further testified that sometime during the next few days, he returned to attempt to ascertain the passcode to Martin's phone.

Next, Detective Holder testified that he returned to the Rogersville Tennessee jail on May 7, 2018, after being contacted by Hawkins County Sheriff's Office Detective Jeff Greer who advised him that Martin had requested to speak with him. Detective Holder met with Martin, mirandized him, and received another executed advice of rights form. Although Martin engaged in a short interview, he subsequently terminated the conversation. The following day, on May 8, 2018, Detective LaFollette contacted Detective Holder, advising him that Martin had asked to speak with him again. Detective Holder then returned to the Rogersville Tennessee jail, but upon arrival, Martin apologized before asserting that there must have been a misunderstanding because he actually wanted to speak with Hawkins County law enforcement, not Detective Holder.

While leaving the jail, Detective Holder encountered Martin's parents. Detective Holder testified that he gave Martin's parents his business card and advised them that if their son wanted

to speak with him, they should have Martin contact him at the phone number on the card. On cross-examination, Detective Holder denied that he told Martin's parents that he could help Martin "get out of this" if Martin would talk with him. Detective Holder acknowledged that, "I probably might have said, you know, if John talks to me or cooperates with us, I can go to the Commonwealth Attorney and talk to him, you know. But I never told him that I would help him get out of it." During the suppression hearing, Martin's father testified that he advised his son not to talk to police without a lawyer, but Martin's mother testified that during this brief encounter Detective Holder advised her that he thought her son had a good case, that he really wanted to talk to Martin, and that he wanted to help her son. Detective Holder testified that the same night (May 8) at about 10:00 p.m., Martin's mother phoned him and advised that she and her husband had spoken to Martin and that Martin would like to speak to him in exchange for a pack of cigarettes.

As a result, the following day, May 9, 2018, Detective Holder returned yet again to the Tennessee jail to speak with Martin. He mirandized Martin again, and Martin signed an advice of rights form for the third time. Martin confirmed that he wanted to make a statement in exchange for a pack of cigarettes. Detective Holder, accompanied by another investigator, interviewed Martin for over two hours. During that recorded interview, which was later admitted in evidence at trial, Martin admitted to shooting Pierce with a Glock 19 handgun Martin owned. Martin confessed that he and Pierce exited his Ford Bronco at the Scott County location where Pierce's body was recovered, purportedly to talk about four-wheeling. Martin also admitted to confronting Pierce about having an affair with Dawn. He confessed that he told Pierce that he knew about the affair with his wife because of recording devices he had hidden in Dawn's vehicle and at their marital home. Martin stated that he had been holding his Glock firearm at his side and Pierce was holding a stick during their confrontation. Martin related that Pierce

lunged at him, causing Martin to fall backwards and accidentally discharge his firearm two or three times as he fell. He claimed that he then called out to Pierce before taking a cell phone photo of Pierce's lifeless body. He maintained throughout the interview that the killing was accidental.

Martin then admitted to going home and confronting Dawn. He stated that he woke her by getting on top of her and controlling her hands. He confessed that he showed her a picture of Pierce's deceased body and admitted to her that he had killed Pierce. Martin also admitted to telling Dawn that he should shoot her and then himself. He admitted to binding her hands together with zip ties in case she reacted badly when he told her about Pierce's death. He said that later, after he saw that she was calm, he cut the zip ties, which were uncomfortably tight, and zip tied her hands again, but more loosely than before. He stated that he had his Glock 19 handgun the entire time he was with Dawn, but that he left it in his waistband and never held it in his hand.

At the end of the interview, Martin signed a written summary of the interview as transcribed by Detective Holder. As a result of the interview, Detective Holder collected the Glock 19 handgun from the Hawkins County jail evidence room before leaving the jail. He then submitted the handgun to the Virginia Department of Forensic Science for analysis.

When the Commonwealth called Dawn to testify at the July 29, 2020 suppression hearing, she invoked her spousal privilege from testifying against her husband, Martin. The trial court continued that issue to a subsequent hearing to allow briefing on whether Dawn could be compelled to testify despite her exercising her spousal privilege. Martin's counsel also moved the trial court to dismiss the aggravated malicious wounding charge, contending that Martin could not be prosecuted for both first-degree murder and aggravated malicious wounding without violating double jeopardy. The trial court opined that the double jeopardy issue raised in the

motion to dismiss could be addressed by simply instructing the jury to only consider the aggravated malicious wounding charge if they found Martin not guilty of the murder charge and denied the motion to dismiss.

The trial court held the subsequent hearing on September 2, 2020, whereupon Dawn again asserted her spousal privilege. Based on the briefs previously filed, the trial court ruled that the alleged crimes against Pierce and Dawn were part of a common scheme. Thus, the trial court ruled that Dawn, as the victim of one of the crimes involved, was ordered to testify despite asserting the spousal privilege. Dawn then testified at the hearing consistent with her previous statements to law enforcement in Tennessee concerning what occurred after Martin returned to their home and awoke her on May 3, 2018.

C. *Martin's Trial*

At trial, Dawn testified consistent with both her previous statements to Tennessee law enforcement and her testimony during the September 2, 2020 hearing. The trial court also permitted, over Martin's objection, the admission of a certified copy of Martin's February 15, 2019 conviction for aggravated kidnapping in the Circuit Court for Hawkins County, Tennessee.

Detective Holder testified concerning his previously recorded May 9, 2018 interview of Martin, and an edited copy of the audio recording of that interview was admitted in evidence without objection. Detective Holder further testified concerning the retrieval of Martin's Glock handgun from the Hawkins County Sheriff's Office, and the handgun was also entered in evidence without objection.

Special Agent Jeffrey Foutz of the Virginia State Police testified regarding deleted search histories he recovered while analyzing Martin's cell phone, including "how much force to crush a skull" on April 30, 2018, how to read text messages from another phone on May 1, 2018, and

an undeleted search of firearms manufacturers. Although counsel for Martin objected to the testimony, no grounds for the objection were stated in the record.

Laura Hollenbeck of the Virginia Department of Forensic Science, an expert in firearms, testified that she had received the Glock 19 9-millimeter firearm and that it did not have a "hair trigger" or any other abnormality in the trigger. She also opined that the two bullets recovered during Pierce's autopsy were fired from the same Glock 19 handgun. Finally, she testified that the handgun was a semi-automatic firearm, therefore the trigger had to be pulled to fire one shot, and it had to be released and pulled again to fire another round.

Dr. Ohanessian, an expert in forensic pathology from the Office of the Chief Medical Examiner, opined that the cause of death was three gunshot wounds to Pierce's head and torso. She further opined that Pierce had been shot in the back, in the neck with an entrance wound from behind, and in the left side of his head, again from behind. She testified that one of the wounds had an upward trajectory while two of the wounds travelled horizontally through Pierce's body. Finally, Dr. Ohanessian opined that Pierce's wounds were inconsistent with Martin's version of events that Pierce was facing Martin when shot.

Next, Martin testified on his own behalf that he had not planned on killing Pierce. Martin did, however, admit on cross-examination to being aware that Dawn was planning on moving in with Pierce, but maintained that he stumbled and fell, accidentally shooting Pierce. Martin also confirmed that after the shooting, he went home, awoke Dawn, held her down, and bound her hands with zip ties. He also admitted that he showed Dawn the cell phone image of Pierce's dead body and advised her that he had shot Pierce in the head, heart, and "balls."

At the conclusion of all the evidence, Martin moved to strike the Commonwealth's evidence and to have the jury view the scene of the killing. The trial court denied the motion to strike based on the evidence as well as the motion for the jury to view the scene, reasoning that

because a video showing the entire length of Cameron Church Road, relevant maps, and contemporaneous photographs of the location had all been admitted to evidence, there was no need for a jury view. The trial court also noted that three years had passed since the alleged murder and reasoned that relying upon contemporaneous photographs precluded any confusion that any potential changes to the scene might create if the jury viewed it.

The trial court instructed the jury including an instruction not to consider the charge of aggravated malicious wounding if they found Martin guilty of first-degree murder. The parties presented closing arguments; the jury then deliberated and convicted Martin of first-degree murder and the use of a firearm in commission of that felony.

### D. *Post-Trial Motions*

Post trial, Martin filed a motion for a new trial based on three grounds argued for the first time. First, he initiated a post-trial *Batson v. Kentucky*, 476 U.S. 79 (1986), challenge based on the composition of the jury which was composed of nine women and three men. Second, he contended that the presence of Pierce's mother who displayed emotion during the trial prejudicially influenced the jury. Third, he argued that since Martin resided in Tennessee, his right to a trial by his peers was violated because he was tried before a jury composed of residents of Virginia. On March 2, 2022, the trial court denied the motion for a new trial and sentenced Martin to life imprisonment plus three years. This appeal followed.

### II. ANALYSIS

### A. *The trial court did not err in denying the motion to suppress.*

Martin contends that the trial court erred in denying his motion to suppress because law enforcement reinitiated interrogation after Martin asserted that he wished to speak to counsel. Martin contends that his parents became agents of the Commonwealth through their contact with Detective Holder. Thus, any statement Detective Holder made to encourage him to speak with

law enforcement constituted the Commonwealth improperly initiating contact with Martin after he asserted his right to counsel under the Fifth Amendment. Although it is well-settled law that further *Miranda* warnings and apparent waiver does not purge the effects of a nonconsensual governmental inquiry after invocation of a right to counsel, the facts here do not support Martin's contention that (1) his parents became agents of the Commonwealth or (2) that Detective Holder unconstitutionally reinitiated an interrogation after the right to counsel was asserted.

"When challenging the denial of a motion to suppress evidence on appeal, the defendant bears the burden of establishing that reversible error occurred." *Street v. Commonwealth*, 75 Va. App. 298, 303-04 (2022) (quoting *Mason v. Commonwealth*, 291 Va. 362, 367 (2016)). The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." "For purposes of a Fifth Amendment self-incrimination challenge, '[v]oluntariness is a question of law, subject to independent appellate review.'" *Secret v. Commonwealth*, 296 Va. 204, 225 (2018) (alteration in original) (quoting *Avent v. Commonwealth*, 279 Va. 175, 195 (2010)). "Subsidiary factual questions, however, are entitled to a presumption of correctness" and will be upheld unless they "are plainly wrong or without evidence to support them." *Id.* at 225-26 (internal quotation marks omitted).

A person may waive his rights under *Miranda*, 384 U.S. at 478-79, "'if the waiver is made knowingly and intelligently,' and the Commonwealth 'bears the burden of showing a knowing and intelligent waiver.'" *Tirado v. Commonwealth*, 296 Va. 15, 27 (2018) (quoting *Angel v. Commonwealth*, 281 Va. 248, 257-58 (2011)). "[W]hether the waiver was made knowingly and intelligently is a question of fact," and the trial court's determination on this issue "will not be set aside on appeal unless plainly wrong." *Id.* at 27-28 (alteration in original) (quoting *Angel*, 281 Va. at 258). "[A]n accused, . . . having expressed his desire to deal with the

police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

"'Whether a person acted privately or as an agent of the state is a question of fact that must be decided on the circumstances of each case. Resolution of the agency issue "necessarily turns on the degree of the Government's participation in the private party's activities."'" *Sabo v. Commonwealth*, 38 Va. App. 63, 74 (2002) (quoting *Mills v. Commonwealth*, 14 Va. App. 459, 463 (1992)). "Of critical importance, for an agency relationship between a private citizen and the government to exist, both parties must have manifested their consent to that relationship, either expressly or by necessary implication from their conduct." *Id.* (citing *United States v. Koenig*, 856 F.2d 843, 847 n.1 (7th Cir. 1988)). And despite its critical importance, "government knowledge of the private person's conduct . . . is not enough, standing alone, to establish the requisite agency." *Id.* (citing *United States v. Kinney*, 953 F.2d 863, 865 (4th Cir. 1992)).

In *Mills* this Court adopted a two-part test to evaluate whether a private individual acted as a government agent when conducting a search. 14 Va. App. at 463. In *Sabo*, this Court established the same test was applicable for analysis under the Fifth as well as the Fourth Amendments of the United States Constitution. 38 Va. App. at 73. The first prong of that test is "(1) whether the government knew of and acquiesced in the search, and (2) whether the search was conducted for the purpose of furthering the private party's ends." *Id.* at 74-75 (quoting *Mills*, 14 Va. App. at 463-64). We have cautioned that "these two criteria or factors 'should not be viewed as an exclusive list of relevant factors.'" *Id.* at 75 (citing *Mills*, 14 Va. App. at 464). "Other factors include whether the private party acted at the request of government and whether the government offered a reward." *Id.* (quoting *United States v. Smith*, 27 F. Supp. 2d, 1111, 1115 (C.D. Ill. 1988)); *see also United States v. Garlock*, 19 F.3d 441, 443 (8th Cir. 1994)

- 11 -

(explaining that defendant must show "the government exercised such coercive power or such significant encouragement that it is responsible" for the individual's conduct). A private party's status "'can only be resolved "in light of all the circumstances."'" *Sabo*, 38 Va. App. at 75 (quoting *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989)).

At the hearing on the motion to suppress, Martin conceded that his motion was only relevant to Martin's mother and not his father, because his father had told him he should only talk to the police with a lawyer present. Martin conceded that with his father giving such advice, he could not be considered an agent of the Commonwealth seeking to induce him to waive his rights. During the hearing on the motion to suppress, conflicting testimony was elicited from Detective Holder and Martin's mother. Detective Holder testified that he told Martin's mother that he wished to speak to her son and that he gave her his contact information. Detective Holder admitted that he might have told her that he would be able to talk to the Commonwealth's Attorney if Martin cooperated. In contrast, Martin's mother testified that Detective Holder advised her that he thought her son had a good case and he just really needed to talk to him, before asking her to get him to agree to do so. The trial court is best positioned to resolve conflicts in the testimony of witnesses. Following the hearing on Martin's motion to set aside the verdict, the trial court stated:

> On the question of the interview confession—whatever we want to call it; there were several of them—each of those has been briefed. We had testimony from the officers who interviewed Mr. Martin at a pretrial suppression hearing, and that issue has been addressed. The Court has ruled on it, and I'm not inclined to change my ruling. Admitting the statement of the Defendant, the subsequent contact with the Defendant was initiated and requested by the Defendant before the officers went back to interview Mr. Martin, on subsequent occasions each time at his request, and he was properly Mirandized.

Clearly, the trial court resolved the conflicting testimony by finding Detective Holder's testimony credible and more believable than Martin's mother's testimony. In the light most

favorable to the Commonwealth, the evidence reflects that Detective Holder simply advised Martin's mother that he would like to talk to Martin and provided her his phone number. Moreover, Martin initiated contact with the law enforcement summoning Detective Holder numerous times. Each time, Martin was properly mirandized. During his last communication requesting that Detective Holder travel to Tennessee to speak with him, Martin voluntarily agreed to be interviewed and provided the same version of events he testified to during the trial. We affirm the trial court's denial of the motion to suppress his statement based on its finding that Martin initiated contact with Detective Holder and voluntarily provided a statement to him which was consistent with the theory he advanced at trial—that the shooting was accidental.

B. *The trial court did not err admitting evidence regarding the kidnapping of Dawn, and any error in admitting the Tennessee kidnapping conviction was harmless.*

In his second and sixth assignments of error, Martin contends that the trial court erred by admitting evidence concerning the kidnapping of his wife and subsequent conviction in Tennessee upon his plea of guilty. We disagree.

"It is well-settled that '[d]ecisions regarding the admissibility of evidence lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (internal quotations omitted)). "A court has abused its discretion if its decision was affected by an error of law or was one with which no reasonable jurist could agree." *Tomlin v. Commonwealth*, 74 Va. App. 392, 409 (2022).

As a general rule, evidence of other crimes, wrongs, or acts is inadmissible if offered merely to show the accused's propensity to commit the crime for which he is charged. *See* Va. R. Evid. 2:404(b). "However, this general rule 'must sometimes yield to society's interest in the truth-finding process, and numerous exceptions allow evidence of prior misconduct whenever the legitimate probative value outweighs the incidental prejudice to the accused.'" *Gonzales v.*

- 13 -

*Commonwealth*, 45 Va. App. 375, 381 (2005) (en banc) (quoting *Dunbar v. Commonwealth*, 29 Va. App. 387, 390 (1999)).

Virginia Rule of Evidence 2:404(b) permits the admission of "evidence of other crimes" at trial when "relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or if they are part of a common scheme or plan." This is true of evidence that "tends to prove any fact in issue, even though it also tends to show the defendant guilty of another crime." *Spencer v. Commonwealth*, 240 Va. 78, 89 (1990). "[O]ther crimes evidence is admissible when it 'shows the conduct or attitude of the accused toward his victim[;] establishes the relationship between the parties[;] or negates the possibility of accident or mistake.'" *Ortiz v. Commonwealth*, 276 Va. 705, 714 (2008) (second and third alterations in original) (quoting *Moore v. Commonwealth*, 222 Va. 72, 76 (1981)). Bad acts evidence is also admissible when it "shows motive, method, intent, plan or scheme, or any other relevant element of the offense on trial." *Id.* (citing *Scott v. Commonwealth*, 228 Va. 519, 527 (1984)).

When otherwise admissible, a defendant "'has no right to have the evidence "sanitized" so as to deny the jury knowledge of all but the immediate crime for which he is on trial.'" *Gregory v. Commonwealth*, 46 Va. App. 683, 696-97 (2005) (quoting *Scott*, 228 Va. at 526). "The fact-finder is entitled to all of the relevant and connected facts, including those which followed the commission of the crime on trial, as well as those which preceded it; even though they may show the defendant guilty of other offenses." *Scott*, 228 Va. at 526-27 (citing *Harris v. Commonwealth*, 211 Va. 742 (1971)).

This is true so long as the evidence is more probative than prejudicial. *See* Va. R. Evid. 2:403. However, "[a]ll evidence tending to prove guilt is prejudicial to an accused, but the mere fact that such evidence is powerful because it accurately depicts the gravity and atrociousness of the crime or the callous nature of the defendant does not thereby render it inadmissible." *Powell*

*v. Commonwealth*, 267 Va. 107, 141 (2004). To be so prejudicial as to not be admissible, the evidence in question must "inflame the passions of the trier of fact, or . . . invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Lee v. Spoden*, 290 Va. 235, 251 (2015).

Here, Dawn testified that after her husband murdered Pierce in Virginia, she was awakened by him as he lay on top of her while holding a gun to her ribs. Martin then showed her a cell phone image of her deceased lover before saying "look what you made me do." He then told Dawn he had shot Pierce earlier that morning "in the balls" and in the head and neck or chest. Martin then told her he intended to finish his plan to kill her and himself. Next, Martin zip tied her hands and feet before telling Dawn he had murdered Pierce after confronting him about their extramarital relationship. He further advised her that he had learned of the affair by listening to recordings of Dawn and Pierce that he collected with a hidden recorder in Dawn's truck and in their marital bedroom. Martin played some of those recordings to Dawn while she was bound.

Martin's kidnapping of Dawn demonstrates a common plan or scheme. Martin first picked up Pierce at his brother-in-law's home, transported him to Virginia, confronted Pierce, and then killed him with a Glock 19 handgun. Martin then returned to his home in Tennessee and threatened his wife at gunpoint before showing her an image of Pierce's dead body on his cell phone. Martin then stated, "look what you made me do" before telling her he had a plan to kill her and then himself. This entire exchange is highly probative of Martin's motive, as well as his intent and plan to kill Pierce. The circumstances of the kidnapping also demonstrate that kidnapping Dawn was part of a common scheme or plan and are therefore relevant connected facts. The relevance of this evidence is heightened by Martin's self-defense argument.

This evidence is also more probative than prejudicial. While highly prejudicial to the defendant, there is no evidence that it would unduly inflame the passions of the jury. And it is so highly probative of Martin's motive and intent and the absence of any mistake or legitimate self-defense that even high prejudice may be tolerated. As a result, the trial court did not abuse its discretion in admitting evidence of Martin's kidnapping of his wife and subsequent conviction in Tennessee.

Further, assuming without deciding that admission of the Tennessee kidnapping conviction itself was error—as opposed to solely admitting testimony as to the facts underlying the kidnapping conviction—any error was harmless. When "the evidence admitted in error was merely cumulative of other undisputed evidence," the error is harmless. *Salahuddin v. Commonwealth*, 67 Va. App. 190, 212 (2017). Here Dawn testified to the facts underlying the kidnapping conviction. In the recorded May 9, 2018 interview, the recording of which was admitted at trial, and during his testimony at trial Martin related essentially the same facts. Therefore, the conviction was simply cumulative of undisputed evidence, and its admission was at most harmless error.

C. *Any error in compelling Dawn to testify against Martin after invoking her privilege not to testify was harmless.*

Martin next contends that the trial court erred by compelling Dawn to testify against him after she had invoked her spousal privilege to decline to testify against her husband. Assuming without deciding that the trial court erred in compelling her testimony, we find any such error harmless.

"Non-constitutional error is harmless '[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" *Salahuddin*, 67 Va. App. at 212 (alteration in original) (quoting Code § 8.01-678). Evidentiary error is harmless if this Court "can conclude 'that the error did not

- 16 -

influence the jury[] or had but slight effect.'" *Id.* (alteration in original) (quoting *Clay v. Commonwealth*, 262 Va. 253, 260 (2001)). When "other evidence of guilt is so overwhelming and the error so insignificant by comparison that the error could not have affected the verdict" or when "the evidence admitted in error was merely cumulative of other, undisputed evidence," the error is harmless. *Id.* (internal quotations omitted).

Here, the evidence of Martin's guilt is overwhelming. First, Martin admitted at trial that he shot and killed Pierce. Second, Dr. Ohanessian testified that each of the three bullets that struck Pierce entered his body from behind and that the wounds were inconsistent with what would be caused had Pierce and Martin been facing each other when Martin fired. The strength of that evidence alone compels us to conclude that Dawn's testimony could have had but slight effect upon the jury in reaching their conclusion. Third, Martin led law enforcement to the crime scene where the deceased's body was found. Fourth, Martin's cell phone image of Pierce's dead body and the firearm used to murder Pierce were both in evidence.

Further, because Martin in his interview with Detective Holder, which was admitted at trial, and on cross-examination stated essentially the same facts as those Dawn testified to, her testimony was cumulative. Dawn's testimony was largely corroborated by Martin in the recorded May 9, 2018 interview. In that interview Martin admitted to waking Dawn by climbing on top of her and controlling both of her hands. He confirmed showing her a picture of Pierce's body on his phone and telling her he had shot Pierce. He confirmed telling her that he should shoot both her and himself. He confirmed that he had zip tied her hands together and that he later cut those zip ties and then again bound her hands with a zip tie, but more loosely than before. He stated that his pistol was tucked in his shorts, not in his hand during all of this. At trial he testified that he climbed on top of Dawn, that he bound her with zip ties, that he showed her a picture of Pierce's body, and told her he had shot Pierce in the head, heart, and "balls."

- 17 -

Therefore, at worst, Dawn's testimony was cumulative, and the other evidence of guilt overwhelming. As a result, any error the trial court might have made in compelling Dawn to testify was harmless.

D. *The trial court did not err in refusing Martin's request to take the jury to view the sight of the shooting.*

Martin next contends that the trial court erred in denying his motion for the jury to view the crime scene. We disagree.

The decision to grant or deny a jury view request "lies within the discretion of the trial court." *Smith v. Commonwealth*, 48 Va. App. 521, 530 (2006) (quoting *Quesinberry v. Commonwealth*, 241 Va. 364, 378 (1991)). Accordingly, "only 'when reasonable jurists could not differ can [this Court] say an abuse of discretion has occurred.'" *Id.* (quoting *Hernandez-Guerrero v. Commonwealth*, 46 Va. App. 366, 370 (2005)).

Code § 19.2-264.1 states:

> The jury in any criminal case may, at the request of either the attorney for the Commonwealth or any defendant, be taken to view the premises or place in question, or any property, matter or thing relating to the case, when it shall appear to the court that such view is necessary to a just decision.

"The question of the propriety of ordering a view . . . lies largely in the discretion of the trial court . . . whose decision will not be reversed unless the record shows that a view was necessary to a just decision." *Prieto v. Commonwealth*, 283 Va. 149, 178 (2012) (quoting *P. Lorillard Co. v. Clay*, 127 Va. 734, 744 (1920)). A trial court "should only grant [a view] when it is reasonably certain that it will be of substantial aid to the jury in reaching a correct verdict." *Id.* (quoting *P. Lorillard Co.*, 127 Va. at 744).

Here, Martin claims that the angle of the ground and proximity to buildings would have been better understood by the jury if they had been taken to the scene of the shooting, and he argues that understanding these things would have allowed the jury to better understand the

- 18 -

shooting. However, the trial court admitted into evidence a video recording reflecting the entire length of the road including the area where the body was found and where the murder took place. Relevant maps were also admitted in evidence. In addition, photographs of the crime scene taken at the time of the homicide were admitted. As the trial court noted in denying the motion, three years had passed since the event occurred creating the possibility that the scene would appear differently than it had at the time of the homicide. Based thereon, the trial court reasonably decided that the maps, video, and pictures in evidence were both sufficient and better reflected the crime scene on the date of the homicide. Since we cannot say that the trial court abused its discretion in so ruling, we will not disturb the decision.

E. *The trial court did not err in permitting the Commonwealth to proceed on both the first-degree murder and aggravated malicious wounding indictments.*

Martin contends that the trial court erred by permitting Martin to be tried for both first-degree murder and aggravated malicious wounding because doing so violated Martin's Fifth Amendment right against double jeopardy. We disagree.

The Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "Whether there has been a double jeopardy violation presents a question of law requiring a *de novo* review." *Hall v. Commonwealth*, 69 Va. App. 437, 444 (2018) (quoting *Fullwood v. Commonwealth*, 279 Va. 531, 539 (2010)).

There are three guarantees in the double jeopardy prohibition contained in the United States Constitution. "It protects against a second prosecution for the same offense after acquittal[;] [i]t protects against a second prosecution for the same offense after conviction[;] [a]nd it protects against multiple punishments for the same offense." *Blythe v. Commonwealth*, 222 Va. 722, 725 (1981) (quoting *Illinois v. Vitale*, 447 U.S. 410, 415 (1980)). "In the single-trial setting, 'the role of the constitutional guarantee is limited to assuring that the court

- 19 -

does not exceed its legislative authorization by imposing multiple punishments for the same offense.'" *Id.* (quoting *Brown v. Ohio*, 432 U.S. 161, 165 (1977)).

Here, the trial court simply recognized that aggravated malicious wounding is a lesser-included offense of first-degree murder, and therefore a conviction on both indictments would violate the double jeopardy prohibition. To ensure a violation would not occur, the trial court instructed the jury that if they convicted Martin of first-degree murder, they were not to consider the aggravated malicious wounding charge. The verdict form also reflected the court's direction to the jury. Since the jury followed the trial court's instruction, Martin was not subject to multiple punishments for conviction on a single offense, and there was no error.

F. *The trial court did not err in disallowing Martin to question the jury venire concerning the range of permissible sentence upon conviction.*

Martin next contends that Code § 19.2-262.01 permitted him on voir dire to question the jury venire regarding the applicable sentencing range upon conviction even though Martin chose not to have the jury make a sentencing recommendation. Since the trial court refused to permit Martin to discuss the applicable sentencing range during jury voir dire, he assigns reversible error to that decision. We disagree.

"[U]nder well-established principles, an issue of statutory interpretation is a pure question of law which [this Court] review[s] de novo." *Green v. Commonwealth*, 75 Va. App. 69, 76 (2022) (quoting *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007)). "[C]ourts apply the plain language of a statute unless the terms are ambiguous or unless applying the plain language would lead to an absurd result." *Emmanuel Worship Ctr. v. City of Petersburg*, 300 Va. 393, 405 (2022) (citation omitted). "It is well-established that the manner of conducting voir dire, including the exclusion of questions to the venire, is committed to the trial court's discretion and [this Court] review[s] its rulings only for abuse of that discretion."

*Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013) (citing *Thomas v. Commonwealth*, 279 Va. 131, 162, *cert denied*, 562 U.S. 862 (2010)).

Code § 19.2-262.01 provides that, "the court and counsel for either party may inform any such person or juror as to the potential range of punishment to ascertain if the person or juror can sit impartially in the sentencing phase of the case." Code §§ 19.2-295 and 19.2-295.1 provide for sentencing by the court without jury recommendation in trials by jury unless the defendant requests jury sentencing. This Court has recently held that, "Code § 19.2-262.01's straightforward language dictates a straightforward rule: the relevant provision [allowing the venire to be informed of sentencing ranges] applies only where a defendant has requested jury sentencing." *Rock v. Commonwealth*, 76 Va. App. 419, 433 (2023).

Here, Martin did not request jury sentencing. Thus, the trial court did not err in preventing Martin from discussing the sentencing range during jury voir dire.

G. *The trial court did not err in denying Martin's* Batson *challenge.*

Martin next contends that the trial court erred in denying his post-trial *Batson* challenge raised for the first time in a motion for a new trial. We disagree.

A motion for a new trial "is a matter submitted to the sound discretion of the circuit court and will be granted only under unusual circumstances after particular care and caution has been given to the evidence presented." *Orndorff v. Commonwealth*, 271 Va. 486, 501 (2006) (citing *Commonwealth v. Tweed*, 264 Va. 524, 528 (2002)). The trial court's findings regarding a challenge under *Batson*, 476 U.S. 79, "will not be reversed unless they are clearly erroneous." *Hamilton v. Commonwealth*, 69 Va. App. 176, 187 (2018) (quoting *James v. Commonwealth*, 247 Va. 459, 462 (1994)).

Code § 8.01-352(A) permits *Batson* challenges to be raised before the jury is sworn and thereafter only upon motion with leave of court. Here, Martin raised a *Batson* challenge to the

gender composition of the jury for the first time in a written motion for a new trial long after the jury had been released and the trial concluded. Martin did not first receive leave of court to make a motion raising a *Batson* challenge. Therefore, the motion was untimely, and the trial court did not err in denying the motion for a new trial on those grounds.

H. *The objection to Pierce's mother's presence during the trial was not timely made.*

Martin next assigns error to the trial court's denial of his post-trial motion for a new trial based on the trial court permitting Pierce's mother to attend the trial and show emotion. In his brief, Martin acknowledges that his objection to her presence was not timely made during the trial and is therefore waived pursuant to Rule 5A:18. However, Martin requests that this Court invoke the ends of justice exception to entertain the assignment of error on its merits. We decline to do so.

Per Rule 5A:18, "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." "The ends of justice exception is narrow and is to be used sparingly," and applies only in the extraordinary situation where a miscarriage of justice has occurred. *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 220 (1997)). "In order to show that a miscarriage of justice has occurred, . . . the appellant must demonstrate that he or she was convicted for conduct that was not a criminal offense or the record must affirmatively prove that an element of the offense did not occur." *Id.* (quoting *Redman*, 25 Va. App. at 221-22). "In order to avail oneself of the exception, [the appellant] must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage might have occurred." *Id.* (alteration in original) (emphasis omitted) (citing *Redman*, 25 Va. App. at 221).

Martin has made no such showing here. Martin argues on brief that "[d]ue to the position of the jurors and the layout of the courtroom, jurors were able to view the victim's mother [who was showing emotion]. A juror could be unduly influenced by the emotion of the mother." Since Martin only asserts that a juror *could be* unduly influenced by the mother of the deceased victim showing emotion, he has failed to provide any basis for showing that a miscarriage of justice *has* occurred. Therefore, the assignment of error is waived.

I. *Martin's objection to the jury trial venire being composed of residents of Scott County, Virginia, was not timely raised.*

Martin next contends that he was not tried by a jury of his peers since he was a resident of Tennessee and was tried by a jury composed of residents of Virginia. We decline to address this dubious argument on the merits because it was not timely made.

Code § 19.2-244(A) provides: "Except as to motions for a change of venue, all other questions of venue must be raised before verdict in cases tried by a jury and before the finding of guilt in cases tried by the court without a jury." Code § 19.2-251 provides that "[a] circuit court may, on motion of the accused or of the Commonwealth, for good cause, order the venue for the trial of a criminal case in such court to be changed to some other circuit court."

Martin contended for the first time in his motion for a new trial that "he was not granted a fair trial, since the jury was not truly comprised of his peers." Counsel for the appellant, on brief, asserts that this is because "[Martin] is from Tennessee and . . . venue would have been proper in Tennessee, since his peers are from there." Since Martin did not move for the trial court to transfer the venue of the jury trial to another circuit court in Virginia but simply moved for a new trial based on a defect in venue, the motion was not timely made. Therefore, the assignment of error is waived, and we will not consider it.

J. *Martin failed to preserve his objection to the admission of evidence from his cell phone's search history.*

Martin next argues that the trial court erred in admitting evidence over his objection from his cell phone's search history regarding how much pressure is necessary to crush a human skull because the evidence was both irrelevant and more prejudicial than probative. We find that he failed to preserve this objection.

"[O]n appeal the judgment of the lower court is presumed to be correct and the burden is on the appellant to present to us a sufficient record from which we can determine whether the lower court has erred in the respect complained of." *Justis v. Young*, 202 Va. 631, 632 (1961). "If the appellant fails to do this, the judgment will be affirmed." *Id.* Rule 5A:18 provides "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling . . . ."

Here, Martin objected to the Commonwealth's question eliciting the contents of his phone's search history, but he failed to state the grounds for his objection on the record. Although a bench conference that was off the record followed the objection, following the bench conference, the Commonwealth proceeded with their questioning and Martin failed to proffer on the record the grounds for his objection. Since the record neither reflects the grounds of Martin's objection nor the ruling of the trial court on the objection, we are unable to evaluate the assignment of error, and we are compelled to determine that Martin has waived this objection.

Martin next asks this Court to invoke the ends of justice exception if we find, as we have, that he has failed to preserve the objection. We decline to do so.

As explained above, the ends of justice exception, "applies only in the extraordinary situation where a miscarriage of justice has occurred." *Holt*, 66 Va. App. at 209. And before this Court will consider an assignment of error under the exception, "the appellant must demonstrate that he or she was convicted for conduct that was not a criminal offense or the

- 24 -

record must affirmatively prove that an element of the offense did not occur." *Id.* (quoting *Redman*, 25 Va. App. at 222). And it is not enough to show "that a miscarriage might have occurred"; an appellant "must affirmatively show that a miscarriage of justice has occurred." *Id.* (emphasis omitted) (quoting *Redman*, 25 Va. App. at 221). Here, at worst, an irrelevant and prejudicial item of evidence was admitted; for the reasons previously stated, the admission of that single piece of evidence when weighed against the enormity of evidence establishing guilt fails to prove either that Martin was convicted for non-criminal behavior or that an element of the offense was not proven

    K. *The Commonwealth presented sufficient evidence of motive and malice to support a conviction for murder.*

Finally, Martin contends that the trial court erred by denying his motions to strike because the Commonwealth failed to show that he acted with malice in killing Pierce. We disagree.

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"Whether an accused acted with malice 'is generally a question of fact and may be proved by circumstantial evidence.'" *Logan v. Commonwealth*, 67 Va. App. 747, 756 (2017)

(quoting *Knight v. Commonwealth*, 61 Va. App. 148, 156 (2012)). "Malice inheres in the 'doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.'" *Tizon v. Commonwealth*, 60 Va. App. 1, 11 (2012) (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)).

Here, a rational fact finder could have concluded that Martin acted with malice based on the evidence adduced at trial. Without recounting all the details of the crime again, at a minimum the evidence reflected that Martin transported Pierce to a secluded location in Scott County, Virginia, where he confronted Pierce about his extramarital affair with his wife. A forensic expert testified that Pierce was shot three times from behind. Martin then went home, bound his wife, and showed her a picture of Pierce's dead body. As a result, we cannot say that the jury's conclusion that Martin acted with malice is plainly wrong, and therefore we will not disturb the conviction.

III. CONCLUSION

For the reasons above, the trial court's judgment is affirmed.

*Affirmed*.